## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **BRYANT MOORE,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No. RWT 11-cv-3644 |
| | * | |
| **LIGHTSTORM ENTERTAINMENT,** *et al.,* | * | |
| | * | |
| Defendants. | * | |
| | * | |

## MEMORANDUM OPINION

In his Second Amended Complaint, Plaintiff Bryant Moore ("Moore") seeks various forms of relief from Defendants for allegedly using content from Moore's copyrighted works to create the movie *Avatar*, a blockbuster science-fiction film. Defendants now move for summary judgment, arguing that Moore cannot raise a genuine dispute of material fact as to whether (1) Defendants had access to his works and (2) his works are substantially similar in protected expression to *Avatar*. Moore also moves for summary judgment on the issue of Defendants' access to Moore's works in 2003 and on the existence of striking and/or fragmented literal similarities between the works.

## BACKGROUND FACTS

Bryant Moore, a Maryland resident, is a science fiction writer who has written several original works, including the screenplays *Aquatica* and *Descendants: The Pollination* ("*Pollination*"). Second Amended Complaint, Aug. 29, 2013, ECF No. 45 ("Second Am. Compl.") at 1. Moore wrote *Aquatica* between 1992 and 1994, and registered it with the U.S.

Copyright Office in May of 1994.  *Id.* ¶¶ 10-11.  He wrote *Pollination* between 2002 and 2003, and registered it in July of 2003.  *Id.*

Defendants are individuals and entities involved in creating the film *Avatar*.  James Cameron ("Cameron") is a writer, producer, director, and principal owner of Lightstorm Entertainment, Inc. ("Lightstorm"), a California Corporation.  *Id.* ¶ 4.  Cameron wrote the screenplay for *Avatar* and Lightstorm produced the film.  *Id.* ¶ 5.  Twentieth Century Fox Film Corporation ("Fox"), a Delaware corporation with its principal place of business in California, produced and distributed *Avatar*, releasing it worldwide in December of 2009.  *Id.* ¶¶ 6, 8.  *Avatar* subsequently grossed box office earnings of $2,782,275,172, and won Golden Globe and Academy Awards.  *Id.* ¶ 9.

Moore alleges that his copyrighted works pre-date the *Avatar* screenplay and that there is substantial similarity between his copyrighted works and *Avatar*, such that the film and its screenplay infringe his copyrights.  *Id.* ¶¶ 11, 36.  He alleges that Defendants selectively extrapolated themes and content from his copyrighted works and used these "selective and substantial extracts" to "develop, write, and produce the movie *Avatar*."  *Id.*

Moore asserts that prior to Cameron's writing of the screenplay for *Avatar*, he and the other Defendants, Lightstorm and Fox, had access to Moore's two screenplays, *Aquatica* and *Pollination*, as well as related copyrighted drawings.  *Id.* ¶¶ 21-32.  According to Moore's Second Amended Complaint, he first submitted the screenplay for *Aquatica* to Lightstorm in 1994 and then again in 1995, each time through an intermediary.  *Id.* at ¶¶ 23–24.  Eight years later, in early 2003, Moore alleges that he sent a script to Cameron's business manager, and on April 7, 2003, to Tom Cohen, Lightstorm's Creative Director.  *Id.* at ¶ 25–27.  He also submitted a copy of *Pollination* to Lightstorm in July of 2003.  *Id.* ¶ 29.  Moore asserts that he made a

series of follow-up phone calls and sent mail to Lightstorm throughout 2003 and 2004. *Id.* at ¶¶ 30–31.   On April 29, 2005, Moore registered *Pollination*-themed artwork with the U.S. Copyright Office and, on some unstated date, submitted the art to an intermediary alleged to be connected to Cameron. *Id.* at ¶ 32.

Moore requests actual damages and profits in excess of $1,500,000,000, a preliminary and permanent injunction enjoining Defendants from infringing further upon his copyrighted material, an accounting of all gains by Defendants' infringement of his copyrighted works, declaratory relief relating to his copyrights, punitive damages in excess of $1,000,000,000, and statutory damages, attorney's fees, and costs.   Second Am. Compl. at 16-17.

## PROCEDURAL HISTORY

On December 19, 2011, Moore filed his original Complaint in this Court.   ECF No. 1. The Complaint has since been amended twice.   Corrected Am. Compl., June 11, 2012, ECF No. 21; Second Am. Compl.   Moore's Second Amended Complaint originally included six counts, but on March 18, 2013, this Court dismissed all but two on preemption grounds.   ECF No. 59. On April 15, 2013, Moore moved for reconsideration of the dismissal, ECF No. 73, which this Court denied on August 9, 2013.   ECF Nos. 92, 93.   The remaining counts are for alleged copyright infringement of *Pollination* and *Aquatica* in violation of the Copyright Act.

On September 16, 2013, Defendants moved for summary judgment under Fed. R. Civ. P. 56.   Defs.' Mot., Sept. 16, 2013, ECF No. 118.   Moore filed his opposition on October 18, 2013, Pl.'s Opp'n, Oct. 18, 2013, ECF No. 151, and Defendants replied on November 1, 2013.   Defs.' Reply, Nov. 1, 2013, ECF No. 168.   Moore moved for partial summary judgment in his favor on October 18, 2013.   Pl.'s Mot., Oct. 18, 2013, ECF No. 150.   Defendants filed an opposition on

November 1, 2013, Defs.' Opp'n, Nov. 1, 2013, ECF No. 166, and Moore replied on November 18, 2013.  Pl.'s Reply, Nov. 18, 2013, ECF No. 170.  The Court held a motions hearing on November 25, 2013 to consider both motions.

## STANDARD OF REVIEW

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which states that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).  A dispute of material fact is only "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party.  *Anderson*, 477 U.S. at 248-49.  "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law."  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).  "When considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion."  *Id.* (internal quotation omitted).

## ANALYSIS

The Copyright Act of 1976, as amended, provides that an owner of a copyright has the exclusive rights "to distribute copies . . . of the copyrighted work to the public by sale or other

transfer of ownership, or by rental, lease, or lending."   17 U.S.C. § 106(3).   "Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 . . . is an infringer of the copyright or right of the author . . . ."   *Id.* § 501(a).   To establish a claim of copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."   *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 361 (1991).   The parties do not contest that Moore owns a valid copyright in his works.   While there is no evidence of literal copying, a plaintiff can raise a "presumption of copying by showing both that [defendants] had access to [plaintiff's copyrighted material] and that the . . . screenplays in question are substantially similar."   *Towler v. Sayles*, 76 F.3d 579, 582 (4th Cir. 1996).

## I.  Defendants' Access to Moore's Works

In order to prove access, a plaintiff must show that a defendant had a reasonable opportunity to view or copy the work at issue.   "A mere possibility that such an opportunity could have arisen will not suffice.   Rather, it must be reasonably possible that the paths of the infringer and the infringed work crossed."   *Towler*, 76 F.3d at 582.   Moore's Complaint posits a number of ways that Defendants may have accessed his works but fails to introduce anything more than mere speculation to back these assertions.   The access claims fall into two different time periods: 1994-1996 when Defendants allegedly accessed *Aquatica* through intermediaries and 2003-2005 when Moore formally submitted both *Aquatica* and *Pollination* to Lightstorm.

None of these theories of access creates a dispute of material fact.   "[S]peculation and conjecture" that Defendants may have accessed the works, that amount to no more than a "tortious chain of hypothetical transmittals… [are] insufficient to infer access."   *Towler*, 76 F.3d

at 583. *See also Eaton v. National Broadcasting Co., et al.*, 972 F. Supp. 1019, 1025 (E.D. Va. 1997) ("[H]ypothetical possibilities [that someone may have forwarded a script to a senior executive] are mere conjectures insufficient to create a genuine issue of material fact.").

### a. The 1994-1996 Access Claims

Moore alleges that during this time period, he gave his screenplays to two intermediaries who could have transmitted them to Cameron. The first of these is Howard Gibson, a production assistant who worked on the set of James Cameron's movie *True Lies*. Second Am. Compl. ¶ 22. Although acknowledging that Moore gave him a copy of *Aquatica* around 1994, Gibson testified in deposition that he only spoke to Cameron once during his employment and never passed the script to Cameron or anyone at Lightstorm. Defs.' Mot., Ex. Williams 25, ECF No. 118-106. Despite this testimony, Moore argues that there remains a question of fact about whether Gibson delivered the screenplay to Lightstorm. In 1994, Gibson went to Lightstorm's offices and met with a white male with brown hair in his late-twenties or early thirties for a job interview. Pl.'s Opp'n at 13. Moore relies on the testimony of another Lightstorm employee who said that Tom Cohen, an employee who later became a creative executive, fit a similar description, and argues that Gibson may have given Cohen a copy of the screenplay during his interview. Pl.'s Opp'n at 13-14. In a summary judgment analysis, "[t]he nonmoving party . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Moore's argument is just such speculation.[1] Furthermore, even assuming that Gibson met with Cohen, Gibson

---

[1] On page 14 of his Opposition, Moore attempts to make various other inferences from Gibson's deposition testimony to suggest that he may have delivered the script to someone at Lightstorm at some time. For example, Gibson testified that if he told Moore he passed the script along, he would not have lied to him about it. Moore attempts to bootstrap this to his own testimony that Gibson told him that he passed the script on and discussed it at

denied bringing the script to the interview and "a copyright plaintiff cannot base [his or] her opposition to summary judgment entirely on the hope that a fact finder will disbelieve the persons who have submitted affidavits on issues of access." *Eaton*, 972 F. Supp. at 1024 (internal quotation omitted).

The second alleged intermediary during the 1994-1996 time period is Anthony Lancto, an employee of Fox Broadcasting (a different corporate entity from Defendant Twentieth Century Fox) to whom Moore gave a copy of his screenplay. Defs.' Mot. at 14; Affidavit Lancto, ECF No. 118-50. In his deposition, Lancto unequivocally denied delivering the script to or having any relationship with Defendants. *Id.* Moore's Opposition and oral argument did not address this issue and there is nothing in the record to suggest that any issue of fact exists with regard to this alleged intermediary.

b.   James Cameron's Scriptment Pre-Dates the Other Access Claims

James Cameron originally completed a "scriptment" of *Avatar*—a "detailed script-length treatment that contains the plot, sequence of events, characters, themes, moods, and settings contained in the film"—no later than March of 1996.[2] Defs.' Mot. at 6. Cameron states that he concluded that the technology was not sufficiently developed at the time to make the film and he saved the scriptment until 2005, at which time he resurrected the project and began working on the movie. *Id.*

---

Lightstorm's offices in order to create an issue of fact. Pl.'s Opp'n at 14. The tenuous chain of inferences Moore asks the Court to make is not sufficient to defeat a motion for summary judgment.

[2] There is some dispute regarding whether Cameron gave inconsistent testimony about whether he finished the scriptment in 1995 or 1996. Moore's Opposition makes much of this issue and even implies that Cameron was attempting to be misleading in his deposition. Pl.'s Opp'n at 8-9. Defendants, however, accurately describe this issue as a "red herring." Defs.' Reply at 3. As the 1994-1995 access claims are frivolous, whether Cameron wrote the scriptment in 1995 or 1996 is immaterial as Moore doesn't claim to have given the screenplay to Lightstorm again until 2003. *Id.* This is not a material fact that could affect the outcome of a trial.

Although there were clearly some changes made in the film, the major copyright eligible elements of the work are contained in this early scriptment.  *See* Expert Report of Mark Rose, Defs.' Mot., ECF No. 118-61; Expert Report of Jeff Rovin, Defs.' Mot., ECF No. 118-63.  Even without considering the expert reports, a comparison of the scriptment and film make clear that they include the same plot, characters, setting and themes.  Any differences between the two are limited to contextual details and elements that are not subject to copyright protection.  In addition, Moore relies on James Cameron's testimony that the scriptment was intended as a "guide" and was not a "complete document" to bolster his argument that it differs materially from the final product.  Pl.'s Opp'n at 6.  The argument is without merit as an independent review of the scriptment shows it is clearly comprehensive and contains the major elements of the film, which the Court has also reviewed.

### c.   The 2003-2005 Access Claims

To prove access, a plaintiff must show that there was "a reasonable opportunity to view the copyrighted work *before* creating the infringing work."  *Building Graphics, Inc. v. Lennar Corp.*, 708 F.3d 573, 578-79 (4th Cir. 2013) (emphasis added).  Therefore, as the scriptment was written at least seven years earlier, whether or not Defendants had access in 2003 is immaterial.  Even if there were significant differences between the scriptment and *Avatar* movie, Moore fails to demonstrate the existence of a genuine issue of material fact with respect to access in 2003.[3]

Neither party disputes that in 2003, Moore submitted both *Pollination* and *Aquatica* to Tom Cohen, a development executive at Lightstorm.  Pl.'s Opp'n at 14.  Cohen treated the scripts in accordance with company practice—he passed them to a third party reviewer who read

---

[3] Note that Moore even argues in his Motion for Partial Summary Judgment that the Court should find as a matter of law that Defendants had access to the scripts in 2003.  Pl.'s Mot. at 7.

them and entered a summary into an electronic database.  In this case, the review was largely

negative and the reader recommended that Lightstorm pass on the scripts.[4]  Defs.' Mot. at 15.

Both Cohen and Cameron deny ever reading or discussing the screenplays.  Defs.' Mot.

at 15.  Such denials, however, are not necessarily dispositive in access cases.  In *Zervitz v.

Hollywood Pictures*, a claim of access was sufficient to survive summary judgment even though

an employee of a production company denied forwarding a screenplay to Defendant who denied

receiving it.  989 F. Supp. 727 (D. Md. 1995).  Despite the denials, the Court found sufficient

"evidence of a channel of communication" between the two individuals to create an issue of fact

as to access.  *Id.* at 729.  In that case, the employee actually read the screenplay, told the plaintiff

she had forwarded it to someone higher up, and had a close working relationship with the

defendant.

Moore relies on a similar case, *Bouchat v. Baltimore Ravens, Inc.*, 228 F.3d 489 (4th Cir.

2000), in which an amateur artist created a logo for the Baltimore Ravens football team.  The

artist spoke with John Moag, Chairman of the Maryland Stadium Authority, who offered to show

the drawings to the team's owner, David Modell, with whom he shared office space.  *Id.* at 492.

On Moag's request, Bouchat faxed him the drawings which, according to the practice of the

office, may have been delivered to the office space he shared with Modell.  Defendants in that

case denied receipt of the drawings but the Court found that this was not dispositive.

> Bouchat offered evidence that his shield drawing was transmitted first to Moag,
> who shared an office with Modell (who had a close relationship with the alleged
> infringers on the design project).  Bouchat testified that Moag offered to forward
> his (Bouchat's) drawings to the Ravens and that Bouchat sent the fax of the
> drawings to MSA, addressed to Moag.  The jury was entitled to credit that

---

[4] Although the online review of the screenplays was written in 2003, Moore claims that information turned over in discovery shows they were updated in 2004, suggesting presumably that they were considered again at that time. Defendants claim that a computer system update is responsible for the change in the date in the library system.  This type of manufactured dispute about immaterial issues, which Moore claims constitute factual issues appropriately determined by a jury, is not sufficient to defeat summary judgment.

testimony…. By proving that the drawings were transmitted to Moag, and that Modell shared the same office space with Moag, Bouchat proved that Modell had 'access' to Bouchat's drawing.

*Id.* at 493. Moore points out that like Moag and Modell in *Bouchat*, Cohen and Cameron shared office space. In fact, Moore makes much of the fact that the Lightstorm offices are small and Cameron and Cohen work in close physical proximity to each other.[5]   This case is distinguishable, however, because Moag told Bouchat he would pass the drawings to Modell whereas Cohen never offered to pass the script to Cameron. Additionally, it is a routine matter for a production company like Lightstorm to receive screenplays. It is for this reason that the company has a protocol in place for reviewing such scripts. Finally, Cohen testified that he and Cameron did not have a close working relationship and in fact only attended a few meetings together during Cohen's thirteen years at the company. Defs.' Reply at 5.

Some courts have applied the corporate receipt doctrine in copyright cases, finding that, "the fact that one employee of the corporation has possession of plaintiff's work should warrant a finding that another employee (who composed defendant's work) had access." *JCW Investments, Inc. v. Novelty, Inc.*, 482 F.3d 910, 916 (7th Cir. 2007). In support of this theory, Moore relies on the Fourth Circuit's decision in *Robinson v. New Line Cinema* 211 F.3d 1265 (4th Cir. 2000) (unpublished), which overturned a district court's finding of summary judgment on the issue of access. In that case, as here, an unsolicited movie script was logged into a company's electronic script library and sent to a third-party reader to review. The Court found that where the person at the company who received the script and the alleged infringer had a "close working relationship, … attended the same weekly meeting … [and] worked for the same

---

[5] Moore also emphasizes the fact that Cameron's office was within 80 feet of the "script library" where the scripts were stored. Pl.'s Opp'n at 17.

company in the same building, only two floors apart … a reasonable jury could find that [access] was reasonably possible."  *Id.* at *2.  While this case has some similarities to *Robinson*, Cohen here testified that he himself never read the screenplays, that he never discussed them with anyone at Lightstorm and that he and Cameron did not have a close working relationship.  Defs.' Reply at 5.  Cases that apply the corporate receipt doctrine contemplate situations where recipients worked closely with alleged infringers.  *See e.g., Moore v. Columbia Pictures Industries, Inc.*, 972 F.2d 939, 943 (parties within the company "had on-going professional and personal relationships").  That is certainly not the case here.

In addition, other courts have "rejected 'bare corporate receipt' as sufficient proof of access, requiring plaintiffs to introduce some evidence that it was 'reasonably possible that the paths of the infringer and the infringed work crossed.'"  *Jones v. Blige*, 558 F.3d 485, 493 (6th Cir. 2009) (quoting *Towler*, 76 F.3d at 583).  In *Glanzmann v. King*, the Sixth Circuit declined to rely on the corporate receipt doctrine and affirmed a finding that it was an "implausible … quantum leap" to assume that Stephen King had access to a script submitted to a secretary at Columbia Pictures.  1988 WL 212507, 2 (E.D. Mich. 1988) (affirmed by *Glanzmann v. King*, 887 F.2d 265 (6th Cir. 1989) (unpublished).  In this case, the mere fact that a script was sent to a production company is insufficient to infer access by everyone at that company.

### d.  Access to *Pollination* Artwork

Finally, Moore alleges that he gave certain *Pollination*-related artwork to an actress named Sybil Danning in 2005 and asked her to transmit the drawings to Defendants.  Danning testified in deposition that she never did so and Moore does not contest this in his Opposition or

produce any evidence of the existence of a factual issue with regard to the drawings.  Defs.' Mot. at 16.

## II.  Substantial Similarity[6]

Even if the Court were to find that there was an issue of fact as to access, summary judgment would nevertheless be appropriate as the works are not substantially similar.  *Comins v. Discovery Communications, Inc.*, 200 F. Supp. 2d 512, 521 (D. Md. 2002) ("'[A] court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar.'") (quoting *Eaton*, 972 F. Supp. at 1023)).  "Proving substantial similarity requires a two-part analysis.  First, a plaintiff must show—typically with the aid of expert testimony—that the works in question are extrinsically similar because they contain substantially similar ideas that are subject to copyright protection."  *Towler,* 76 F.3d at 583. "The 'extrinsic' evaluation should assess the similarity between the two works' objective elements, such as plot, theme, characters, setting, pace, mood, and dialogue."  *Eaton*, 972 F. Supp. at 1026.  "Second, a plaintiff must satisfy the subjective, or intrinsic, portion of the test by showing substantial similarity in how those ideas are expressed."  *Towler*, 76 F.3d at 583-84. "This portion of the test considers whether the intended audience could determine that the works are substantially similar, usually without the aid of expert testimony."  *Id.* at 584.

---

[6] If a plaintiff cannot prove access, courts will still sometimes find copyright infringement if a plaintiff can prove "striking similarity." *Towler*, 76 F.3d at 584-85 ("[P]roof of striking similarity establishes infringement without the necessity of showing access.").  Striking similarity is a standard that requires a showing greater than substantial similarity and must be so similar as to "preclude[] the possibility of independent creation."  *Id.*  Thus, as will be discussed below, as Moore does not present evidence sufficient for a jury to find substantial similarity, he certainly could not meet the striking similarity test.

When reviewing works for substantial similarity, courts must separate out "general ideas, themes, or plots [that] are not eligible for copyright protection," *Eaton*, 972 F. Supp. at 1027. "[C]opyright law does not protect '*scenes a faire*,' i.e., sequences of events that necessarily result from the choice of a setting or situation.  Put another way, *scenes a faire* are 'incidents, characters, or settings which, as a practical matter, are indispensable or standard in the treatment of a given topic.'"  *Id.* at 1029 (internal quotations omitted).

### a.   The "Extrinsic Test"[7]

The Court must make an independent comparison of the works at issue in undertaking the extrinsic test.   Moore, along with his Second Amended Complaint and Opposition to Defendants' Motion for Summary Judgment, submitted lists of alleged substantial similarities between his works and *Avatar*.   The Fourth Circuit, however, has held that "a list comparing 'random similarities scattered throughout the works' is 'inherently subjective and unreliable.'" *Towler*, 76 F.3d at 584 (quoting *Litchfield v. Spielberg*, 736 F.2d 1352 (9th Cir. 1984)).   "Instead [of relying on such lists], a court must analyze [works at issue] and the record, searching for extrinsic similarities such as those found in plot, theme, dialogue, mood, setting, pace or sequence."  *Id. See also Beal v. Paramount Pictures*, 20 F.3d 454, 460 (11th Cir. 1994) ("[S]uch lists are 'inherently subjective and unreliable,' particularly where the list contains random similarities.  Many such similarities could be found in very dissimilar works.").

---

[7] This discussion focuses on Moore's screenplays and not his "Pollination Artwork."  Moore claims, for example, that his mechanical "canopy crawler" is similar to a dinosaur-like creature in *Avatar* and that his human figure is similar to the alien character Neytiri. Defs.' Mot. at 33-34.  There is no issue of fact that these drawings and the six black-and-white sketches that make up Moore's "Pollination Art" have no similarity to images in the *Avatar* movie. "[T]he subject matter, shapes, colors, materials, and arrangement of the representations" differ markedly.  *Cavalier v. Random House, Inc.*, 297 F.3d 815, 825 (6th Cir. 2002) (listing factors to be considered in determining objective similarity in appearance of artwork).  *See also* Expert Report of Vincent DiFate, Defs.' Mot., Affidavit DiFate, Exs. DiFate 1, 2, ECF Nos. 118-64, 118-65, 118-66.

In their Motion for Summary Judgment, Defendants appropriately rely on expert testimony to show that the works are not substantially similar under the extrinsic test. *See, e.g.*, *Dawson v. Hinshaw Music, Inc.* 905 F.2d 731, 732-33 (4th Cir. 1990) ("The plaintiff must establish substantial similarity of both the ideas of the . . . works and of the expression of those ideas. It is well established that expert testimony is admissible for proof under the first prong which courts have referred to as an 'extrinsic' or 'objective' inquiry.") (citing *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984)).

A review of the filings, both parties' expert reports, and the works themselves makes clear that there are no substantial similarities to be found in any of the relevant elements. Any similarities are limited to general stock themes, *scenes a faire* and ideas not subject to copyright protection.

### i. Plot, Theme and Sequence of Events

Courts must look beyond stock themes and ideas in analyzing plot similarities. For example, in *Muller v. Twentieth Century Fox Film Corp.*, the Court held that the plots of two works both telling the story of "an expedition team that travels to Antarctica where they discover an underground ancient pyramid or city, and subsequently encounter hostile forces" were not substantially similar and "[a]ny similarities in plot and structure stem directly from the stock theme of an action-adventure staged in an ancient underground pyramid or city, and thus are unprotectible [sic]." 794 F. Supp. 2d 429, 445 (S.D.N.Y. 2011). *See also Stromback v. New Line Cinema*, 384 F.3d 283, 296 (6th Cir. 2004) ("[T]he sequence of certain events (main characters leaving Hell, battling their brother, the attempted killing of the main character)… are

common themes and ideas throughout literature and are beyond any level of abstraction at which copyright protection might begin to attach.").

Even at the highest level of generality, the plots of the works at issue here are quite different. *Avatar* is about a paraplegic ex-Marine, Jake Sully, who takes over a genetically-engineered avatar body to study the indigenous people of the planet Pandora. At the beginning of the film, Jake Sully works with a corporation mining the planet for resources but after falling in love with an indigenous woman, Neytiri, sides with the native people and fights off the corporation. Defs.' Mot. at 7-8; *Avatar* screenplay, Second Am. Compl., Ex. 5. *Pollination* is a story about two warring groups of humans: pollinators and descendants. A woman who has been fighting the pollinators on her own meets and falls in love with the descendants' war chief and together they are able to defeat the pollinators. *Aquatica* is an underwater adventure story about two warring factions, one of whom is a ruthless evil tribe attempting to dominate the planet. Defs.' Mot. at 12; *Pollination* screenplay, Second Am. Compl., Ex. 6; *Aquatica* screenplay, Second Am. Compl., Ex. 7.

To be sure, the works share certain limited commonalities. *Pollination* and *Avatar*, for example, both involve love affairs between two individuals who subsequently join together to fight a common enemy. *Aquatica* and *Avatar* are both science-fiction, futuristic stories about conflicts between two groups of people. One theme is the main character's transition from scientist to warrior, which is comparable to Jake's transition in *Avatar*. Defs.' Mot. at 13. This type of broad plot similarity is, however, clearly not protected expression.[8] "[T]his degree of similarity between the basic plots of two works cannot sustain a plaintiff's claim that the works

---

[8] Not only are these plots and main themes clearly not substantially similar on anything but the most general level, but Defendants' experts note that major themes in *Avatar* and *Pollination* may actually be the opposite of each other– in *Avatar,* the heroes protect the natural civilization while in *Pollination*, the heroes are the technologically advanced humans who defeat those who want to destroy humans to protect the earth's environment. Defs.' Reply at 14.

are substantially 'similar.'  No one can own the basic idea for a story.  General plot ideas are not protected by copyright law."  *Berkic v. Crichton* 761 F.2d 1289, 1293 (9th Cir. 1985).  A review of the works at issue makes clear that the only similarities between the plots and themes of Moore's works and *Avatar* are elements not eligible for copyright protection and themes common in the science fiction and action genres.

## ii.  Setting

Moore argues that a substantial similarity exists with regard to setting, as there are bio-luminescent mega-forests in each of the works.  Moore claims that both *Avatar* and *Pollination* are "set on a lush, exotic world covered by gargantuan, alien flora and super trees in a forest of giant tree/tree limbs, vast foliage, giant vines and leaves."  Second Am. Compl. Ex. 1 at ¶¶ 12, 83.  The setting of *Aquatica*, though underwater, is allegedly similar to that of *Avatar* because, for example, both settings feature bioluminescence, dramatic foliage and large rainforest-like plants.  Second Am. Compl. Ex. 2 at ¶¶ 8-9.  However, these alleged similarities are either far too general to be protected by copyright law (large forests, bioluminescence) or are *scenes a faire* (a 3-D representation of terrain in a futuristic battle movie).

Defendants also point out that many similar aspects of the setting have been used in other works citing, for example, giant forests in *Fellowship of the Ring* and bioluminescence in *Twenty Thousand Leagues Under the Sea* and *Fantasia.*  Defs.' Mot. at 28.  Other courts have denied claims of substantial similarity in cases with settings far more similar than those at issue here. *See e.g.*, *Muller*, 794 F. Supp. 2d at 446-47 ("Although both works are primarily set in or near Antarctica, and both use an underground pyramid and archeological excavation settings, these are not forms of expression that can be copyrighted.  This is because any similarity based on the

shared use of these common situations is far too general to be the basis of a copyright infringement action."); *Funky Films*, 462 F.3d 1072 (9th Cir. 2006) (two works taking place in "contemporary, family-run funeral home" insufficiently similar).

### iii. Characters and Dialogue

The "basic human traits that certain characters share, including age, sex, and occupation, are too general or too common to deserve copyright protection." *Eaton*, 972 F. Supp. at 1029. In order to find substantial similarity of characters, courts look to details and not just general caricatures. For example, the Eleventh Circuit held in one case that even though both protagonists were "crown princes and sole heirs to the thrones of foreign nations who have come to America" they were not substantially similar because of other distinct character traits. *Beal v. Paramount Pictures Corporation*, 20 F.3d 454 (11th Cir. 1994). For example, the Court found differences in the way each character treated women and also noted that while both characters were rebellious, one character "tends to be brash and impetuous" while the other does not. *Id.* These differences were enough to defeat a similarity claim, showing the level of detailed comparison courts require to find substantial similarity of characters.

Moore argues that the protagonists in *Avatar* and *Pollination* are substantially similar because, for example, both Jake and Gamil are young male soldiers who are "brave, adventurous and strategic. Both lead revolts against those who would plunder their world." Second Am. Compl. Ex. 1 at ¶ 183. These descriptions are stock character traits that could describe any number of protagonists in battle films throughout history.

Moore additionally draws comparisons between female scientists who distrust the main character, matriarchs in their fifties who wear arrow-shaped necklaces, and characters in

wheelchairs.  Pl.'s Opp'n at 35.  He claims that the protagonists' parents in *Avatar* and *Aquatica* are substantially similar because one can "access the voice of ancestors" and the other "has the unique skill of interpreting ancient computer languages, the voice of an ancient dynasty." Second Am. Compl. Ex. 2 at ¶ 2.  Not only are these comparisons insufficient to suggest substantial similarity, but Moore improperly picks and chooses traits of different people instead of comparing parallel characters.  *See, e.g., Eaton*, 972 F. Supp. at 1028 (finding characters not comparable because "[w]hile both Zee and Lou are female mechanics who are good at their jobs Zee is the main character… and Lou is a secondary character").

With regard to dialogue, "extended similarity [is] needed to support a claim of substantial similarity based upon this issue."  *Olson v. National Broadcasting Co., Inc.*, 855 F.2d 1446 (9th Cir. 1988).  Moore's list of random comparisons of words used in the works shows no extended similarity and no reasonable jury, properly instructed, could find substantial similarity of dialogue.

### iv.  Mood and Pace

The mood and pace of Moore's works differ markedly from those of *Avatar*.  Both *Pollination* and *Aquatica* are action-packed war stories, filled with battle scenes and conflict. Though *Avatar* includes a battle scene at the end, it hardly encompasses the entire movie, the first half of which focuses on the relationship between Jake and Neytiri.  In Moore's Complaint, he lists the following as alleged substantial similarities of mood and pace: "In both stories the protagonist is chosen to soldier with science teams" and "In both stories there is concern about the worsening relationship with between [sic] antagonists and protagonists."    Second Am. Compl. Ex. 2 at ¶¶ 124-127.  Not only are these broad and vague, but also they do not even

address mood or pace.  In fact, these alleged similarities are so off base that Defendants suggest

Plaintiff has conceded a lack of similarity.  Whether or not that is true, an independent review of

the works shows marked differences.

### b.  The "Intrinsic Test"

The second part of the inquiry, "intrinsic similarity" involves a review of the "total

concept and feel" of the similarity (or dissimilarity) in "mood," "detail" and "characterization."

*Comins v. Discovery Communications, Inc.*, 200 F. Supp. 2d 512, 521 (D. Md. 2002) (granting

defendants' motion for summary judgment after finding no similarity between the works at

issue).  "The notion of intrinsic similarity . . . requires the court to inquire into 'the 'total concept

and feel' of the works,' but *only* as seen through the eyes of the ordinary observer."  *Lyons*

*Partnership, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 801 (4th Cir. 2001) (quoting *Dawson*

*v. Hinshaw Music, Inc.*, 905 F.2d 731, 733 (4th Cir. 1990)) (emphasis in original).  "In most

cases, when a copyrighted work will be directed at the public in general, the court need only

apply a general public formulation to the intended audience test."  *Id.*  In this case, the general

public appropriately describes the intended movie-going audience.

Moore alleges that *Avatar* contains "extrapolated expressions of ideas" from *Pollination*

and *Aquatica*, including "themes," "moods," and "tones."  Second Am. Compl. at 2.  In his

Opposition, Moore argues that he "can cite to over one hundred (100) substantial similarities and

at least seven (7) fragmented literal similarities, the combination of which makes certain the two

works' similarity in the mind of a reasonable jury."  Pl.'s Opp'n at 44.[9]  This mischaracterizes the

---

[9] The fact that Moore's expert stated that striking and substantial similarities exist between *Avatar* and Moore's works is not sufficient to create a dispute of material fact.  *See McRae v. Smith*, 968 F. Supp. 559, 567 ("Although plaintiff's experts opine that the songs are strikingly similar or so similar as to preclude independent creation, an

intrinsic similarity test for which courts have consistently held that lists of random similarities are insufficient. Regardless, a review of the works leaves no doubt that there is no intrinsic similarity between them.  In fact, the total concept and feel of *Avatar* and Moore's screenplays is "palpably different." *Eaton*, 972 F. Supp. at 1030.

### III.  Fragmented Literal Similarities

Moore also argues that his Complaint should survive summary judgment because there are "striking and/or fragmented literal similarities" between the works.  Pl.'s Mot. at 1.  Some courts have found that the substantial similarity test can by modified "for situations in which a smaller fragment of a work has been copied literally, but not the overall theme or concept-an approach referred to in the literature as 'fragmented literal similarity.'  . . . Thus, the copying of a relatively small but qualitatively important or crucial element can be an appropriate basis upon which to find substantial similarity." *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 275 (6th Cir. 2009).

Moore moves for partial summary judgment on this issue as well and lists eight alleged "literal similarities" between the works.  Pl.'s Mot. at 10-12.  For example, in *Aquatica* and *Avatar*, main characters speak to a group of people gathered by the "Eastern Sea."  *Id.* Additionally, Moore argues that 3-D yellow and green holographic maps of the forest and upside down trees with plants growing out of them are literal similarities.  *Id.*  Not only do both of these amount to nothing more than *scenes a faire*, but also they do not represent "qualitatively important or crucial" elements of any of the works.

---

issue of fact cannot be created by merely reciting the magic words 'strikingly similar' and 'no possibility of independent creation.'").

Another alleged "fragmented literal similarity" that Moore emphasizes is the following description of trees:

> **POLLINATION**: "Deposited on the tree tops are five large inflatable circular 'sleds' that are shaped like a tire with **spokes** which curve upward then downward. (the spokes are also inflatable). Between each "**spoke**" is a **trampoline** style mesh." *Pollination* at 110.

> **AVATAR**: "The sleeping level -- families nesting in groups on woven hammocks the size of **trampolines**. The hunters sleep along **SPOKES** joining the inner trunk to the tree's outer shell." *Avatar* at 51; *see Avatar* film at 00:47:52:00.

Pl.'s Mot. at 12.  Despite use of the words "spoke" and "trampoline" in each, this is not the type of literal or quasi-literal similarity that necessitates a finding of copying, nor is this description a "qualitatively important or crucial" element of either work.  *Bridgeport Music*, 585 F.3d at 275. The other five alleged "fragmented literal similarities" in Moore's motion are comparable. Moore simply mischaracterizes what courts consider to be literal similarities and these claims are without merit.

## IV.  Independent Creation

If the Plaintiff had presented a prima facie case of copyright infringement, evidence that Defendants had independently created the work at issue could be used to rebut the presumption of copying.  In the Fourth Circuit, independent creation is not considered to be an affirmative defense and "defendants, therefore, do not have the burden of persuasion for independent creation."  *Keeler Brass Co. v. Cont'l Brass Co.*, 862 F.2d 1063, 1066 (4th Cir. 1988). "Evidence of independent creation simply tends to prove the reverse of th[e] proposition" that the defendants copied the works.  *Id.  See also Watkins v. Chesapeake Custom Homes, L.L.C.*, 330 F. Supp. 2d 563, 575 (D. Md. 2004) ("Evidence of substantial similarity and access presents

a prima facie case of copying.  However, that presumption is rebutted where the defendant presents evidence that the allegedly infringing work was 'independently created.'  . . .  This is true even if the infringing work is 'practically identical' to the copyrighted work.").

As summary judgment is appropriate with regard to access and substantial similarity, the issue of independent creation need not be addressed in depth.  Suffice it to say that Defendants present a strong case for independent creation that rebuts a presumption of copying.  Cameron submitted a comprehensive declaration that specifically addresses Moore's allegations and points to past projects and other sources of inspiration from which he drew in writing *Avatar*.  For example, he discusses how a story he wrote in college addressed the issue of "transitioning from a disabled body" which inspired Jake Sully's handicap.  Cameron Decl. at 10.  He introduced a sketch he drew in high school of a large tree on which he modeled the "hometree" in *Avatar*.  Defs.' Mot. at 49.  He also, for example, claims that a film he worked on in the 1970s, *Xenogenesis*, featured a similar setting to that in *Avatar* (willow-like trees, blue and green bioluminescence, etc.).  Cameron Decl. at 12.  Cameron's detailed declaration and accompanying exhibits are persuasive.

## **CONCLUSION**

In conclusion, the story of Jake Sully and his exploits are the original work of the Defendants and the Plaintiff has failed to demonstrate any valid claim of a violation of his copyrights.   Accordingly, the Court will, by separate Order, grant Defendants' Motion for Summary Judgment, deny Moore's Motion for Partial Summary Judgment and deny as moot Defendants' Motion to Strike Exhibits.


Date:  January 16, 2014                                        _____/s/_____
                                                                                                    ROGER W. TITUS
                                                                                     UNITED STATES DISTRICT JUDGE